**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-cr-30032 |
| | ) | |
| **MICHAEL D. TIMMS,** | ) | |
| Defendant. | ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Defendant's Motion to Suppress Evidence and Statements (Doc. 20).

## I.      BACKGROUND

On July 6, 2022, Defendant Michael Timms was indicted by a grand jury and charged with Possession of Firearm by a Prohibited Person—Felon, in violation of 18 U.S.C. § 922(g)(1) (Count One); Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D) (Count Two); and Possession of a Firearm During and in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3). (Doc. 1.) The Indictment also included a forfeiture allegation relating to the firearm and ammunition. (*Id.*)

On May 22, 2023, Defendant filed a motion to suppress evidence and statements alleging the following: (1) there was no valid basis for a traffic stop; (2) Defendant's statements are the fruit of the illegal seizure and are inadmissible under the Fourth

Amendment; and (3) Defendant's statements to Officer Lamar Moore violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and should be excluded. (Doc. 20.)

The Government claims the traffic stop of Defendant was valid because officers observed Defendant commit a traffic violation. (Doc. 22 at 18.) The Government further alleges Defendant made certain statements that were not part of a custodial interrogation and should not be excluded. (*Id.* at 13-17.) In particular, the Government contends Defendant's statement, "I got a gun in the back," should not be excluded. (*Id.*) The Government acknowledges certain statements made by Defendant when he was handcuffed and inside Moore's squad car with the door shut—statements relating to his status as a felon and use of cocaine--were custodial statements without the protection of *Miranda* and should be suppressed. (*Id.* at 17-18.) Therefore, the only issues facing the Court are whether Officers Moore and Colton Redding observed a traffic violation and whether Defendant's statement "I got a gun in the back" should be suppressed.

Following the Government's response (Doc. 22) to Defendant's motion to suppress, the Court held a hearing on the motion on August 2, 2023. Defendant and Officers Moore and Redding testified at the hearing. Both parties introduced exhibits. On September 1, 2023, the parties filed supplemental briefs (Docs. 28, 29) in support of their respective positions.

## II.     FACTUAL BACKGROUND

On May 31, 2022, Defendant was arrested following a traffic stop of Defendant's vehicle at the Circle K gas station located at the corner of North Grand Avenue and 19th

Street in Springfield, Illinois. (Doc. 20 at 1.) During the suppression hearing, Officers Lamar Moore and Colton Redding with the Springfield Police Department (SPD) Street Crimes Unit testified they were patrolling in that area after receiving a tip from an officer with the SPD's drug unit that there would be a white Infinity SUV traveling in that vicinity with a firearm and drugs. Redding testified he and Moore were contacted because, as members of the Street Crimes Unit, they were typically tasked with stopping a vehicle if a traffic stop was sought. Moore and Redding testified they observed Defendant's white Infinity SUV fail to use its turn signal before making a left turn into the gas station. (Doc. 28 at 2.) Both officers testified Redding was positioned directly behind Defendant while Moore was behind Redding. Moore testified he was not sure how far he was behind Defendant. Defendant testified he did use his turn signal to move to the 19th Street turn lane upon noticing that traffic was backed up due to a red light at the North Grand Avenue intersection. Instead of turning on North Grand, Defendant turned into the gas station because his father wanted him to stop for cigarettes. The officers conducted a traffic stop in the parking lot of the Circle K gas station. (*Id.*)

Defendant exited his vehicle before the officers finished approaching. (*Id.*) Moore pulled his police department SUV in front of Defendant's vehicle, got out of the police vehicle, and ordered Defendant to stop walking towards the gas station. (Doc. 20 at 2.) Redding arrived from the rear and pulled his unmarked police SUV up to the pumps next to Defendant's SUV. (*Id.*) Redding testified that he approached Defendant and informed him of the two reasons for the traffic stop—the SUV's window tint and failure to signal. (Doc. 28 at 2.) Redding asked Defendant, "What's up with these tints, man?" (Doc. 20 at

2.) Defendant stated the tinted windows were legal. (*Id.*) When Redding asked Defendant for identification, Defendant inquired, "My tints?" to which Redding responded, "tints and turn signal." (*Id.*) Defendant asked Redding, "you're pulling me over for my tints?" to which Redding replied, "and your turn signal." (*Id.*) Redding testified he did not tell Defendant he was stopped for failing to signal for 100 feet before turning. Redding's police report indicated the reasons for the stop were for illegally tinted windows and failure to signal for 100 feet before turning. Moore testified that, at the time of the traffic stop, he believed Defendant's vehicle was equipped with illegal tints before later learning that the Illinois law does not apply to vehicles properly registered in other states. Moore also testified he informed Defendant during the traffic stop that he failed to use his turn signal before turning into the Circle K. Moore did not tell Defendant that he failed to signal for 100 feet before turning.

When Defendant provided his driver's license to Redding, Moore asked Defendant if his vehicle had insurance. (*Id.*) Defendant stated the SUV belonged to his girlfriend and he believed she had insurance. (*Id.*) Defendant was instructed to stand in front of the vehicle, where he talked to Moore about vehicle insurance. (*Id.*) Redding could see improperly packaged marijuana inside the vehicle. (Doc. 22 at 3.) Redding asked the passenger, Defendant's father Michael S. Timms, to exit the vehicle while he searched the SUV. (*Id.*)

Upon searching the vehicle, Redding recovered a Taurus G3 pistol, two plastic bags containing approximately 536 grams of suspected marijuana, a digital scale, an additional three plastic bags of suspected marijuana found inside the vehicle's interior,

cocaine, unused plastic zipper bags found in the center console, yellow pills suspected to be Vidalista, black and purple pills suspected to be Viagra, and a rail-mounted laser/light firearm attachment. (*Id.*)

While Defendant was trying to watch Redding search his car, Moore repeatedly told Defendant to back away from the car. (Doc. 20 at 3.) Defendant told Moore he was on his way home to Nashville and had stopped to get gas. (*Id.*) He further explained he had grown up in Springfield and had been in town visiting his brother, who lived near the gas station. (*Id.*) When Moore told Defendant he appeared to be nervous, Defendant stated he was upset that the other officer was searching his car and going through his personal items. (*Id.*)

After locating the firearm, Redding approached Defendant and handcuffed him. (Doc. 22 at 3-4.) As Defendant was being handcuffed, he was talking to the officers. The following exchange occurred, which is captured on Moore's body camera and filed as Defendant's Exhibit B:

Redding: Whenever we see the weed, it's, like, we have to address it.

Timms: What's going on? What's going on? What's the problem?

[Defendant handcuffed by Redding].

Moore: I, I don't know, bro.

Redding: Got that blicky, brother.

Timms: (Sighs)

Moore: You got a blicky[1] in there, bro?

(Moore radios to dispatch).

Timms: Dad, get my keys.

Moore: Step back here, bro.

Timms: Come on, bro. I'm from out of town.

Moore: So, tell me, okay. Hold on.

Timms: I'm from out of town, bro, please.

Moore: Sit down, sit down right here. Sit. Tell, what's going on?

[Defendant is directed to sit on the side floorboard of Moore's squad car; the squad door is open].

Timms: I'm from out of town, bro. Please man.

Moore: What is, I don't know what's going on.

Timms: I mean, I don't neither (unintelligible).

Moore: I didn't search your car, I don't know what's up (background noises), you know what I mean?

Timms: (Unintelligible) gun in the back.

Moore: What?

Timms: I got a gun in the back.

---

[1] The Government notes "blicky" is a slang term for a firearm. (Doc. 22, 4, n.3.)

(*Id.* at 4-5.) After handcuffing Defendant, Redding returned to the SUV to collect the gun and continue searching. (Doc. 20 at 4.) The gun was placed in an evidence box in the back of Moore's police vehicle. (*Id.*)

Defendant was eventually directed to move from his position of the passenger area with the door open to sit fully in the front passenger seat of Moore's squad car with the door closed as Moore prepared the arrest paperwork. (Doc. 22 at 5.) While Redding was searching Defendant's vehicle, Moore continued to question Defendant. (Doc. 20 at 4.) Moore asked Defendant if he was nervous about the gun and whether he had a FOID card or a concealed carry permit. (*Id.*) After taking items out of Defendant's pants pockets, Moore asked if Defendant had anything else on him because police "wanted to be sure before we holler at you." (*Id.*) Defendant responded that there was more marijuana in the car. (*Id.*) Moore then asks, "So all you got in there is drugs, ah, weed?" (*Id.*) After obtaining biographical information from Defendant, Moore asked the dispatcher to run a trace on the gun found in Defendant's car. (*Id.*)

By this point, Sergeant Tyler Lynn of the Springfield Police Department arrived to provide backup. (*Id.* at 5.) Redding asked Lynn to get the personal identification from Defendant's father. (*Id.*) Redding then asked Lynn to read him his *Miranda* rights. (*Id.*) Lynn began reading Defendant his *Miranda* rights before being stopped by a phone call and discussion with Redding. (Doc. 22 at 5.) Redding told Lynn he meant for him to *Mirandize* Defendant's father, not Defendant. (Doc. 20 at 5.) Lynn then *Mirandized* Defendant's father. (*Id.*)

In Moore's police vehicle, Moore asked Defendant if he had any felony convictions, telling Defendant, "I'm going to find out, just tell me." (*Id.*) Defendant acknowledged having a prior felony conviction. (*Id.*) He further stated there was a small amount of cocaine in his SUV. (*Id.*) Moore had not yet *Mirandized* Defendant. (*Id.*) Redding found the cocaine and began walking toward Moore's vehicle. (*Id.*) He asked Moore what Defendant had said about the gun. (*Id.*) Moore informed Redding that Defendant said he had the gun for protection and confirmed he was a felon. (*Id.*)

During the search, Redding seized two small bags of marijuana, the gun, a bag containing about a pound of marijuana, and about 3.7 grams of cocaine. (*Id.* at 5-6.) The officer released Defendant's vehicle to his father and transported Defendant to the Springfield Police Department. (*Id.* at 6.) At the police department, Defendant was read his *Miranda* rights and agreed to be interviewed by Moore and Lynn. (Doc. 22 at 6.) Lynn recorded the questioning on his body camera. (Doc. 20 at 6.) Moore asked Defendant about the gun and marijuana. (*Id.*) Defendant confirmed the prior information he had provided. (*Id.*) He stated he grew up in Springfield but had moved to Nashville and was in town visiting his brother. (*Id.*) He and his father were leaving town to return to Nashville and stopped to get gas. (*Id.*) Defendant stated he had the gun for a number of years, the marijuana was mostly for personal use though he had sold some while in town, and the cocaine was for personal use. (*Id.*)

Defendant was arrested and subsequently indicted by a grand jury and charged in a three-count Indictment.

III.   **DISCUSSION**

   **A. Applicable Law**

   A police officer may stop a vehicle if the officer has reasonable suspicion of a traffic violation. *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021). This applies even to minor traffic infractions. *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020). The question is whether the officer reasonably believed the driver committed a traffic violation, not whether the driver actually committed a traffic violation. *See Cole*, 21 F.4th at 428. An arrest for a traffic violation is not rendered invalid simply because the officers also have an ulterior motive to search for narcotics. *See Whren v. United States*, 517 U.S. 806, 812 (1996). "The government bears the burden of proving by a preponderance of the evidence that reasonable suspicion supported the traffic stop." *Jackson*, 962 F.3d at 357.

   Individuals who are stopped for traffic violations generally are not "in custody" for purposes of *Miranda*. *See Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984). "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440. The officer must provide *Miranda* warnings to the individual before any custodial interrogation commences. *See United States v. Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021). A court considers the totality of the circumstances in determining whether custody has attached. *United States v. Cox*, 54 F.4th 502, 511 (7th Cir. 2022).

   Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are

reasonably likely to elicit an incriminating response." *United States v. Swanson*, 635 F.3d 995, 1002 (7th Cir. 2011) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Courts thus consider "whether a reasonable objective observer" would have believed that the officer's statements to the motorist "were reasonably likely to elicit an incriminating response." *Id.* at 1002. Volunteered statements are not subject to *Miranda* warnings. *United States v. Jones*, 600 F.3d 847, 854 (7th Cir. 2010). "If a defendant makes a statement in response to words or actions by the police that do not constitute interrogation or if the defendant himself initiates further communications, the police are not prohibited from 'merely listening' to his voluntary statement." *Id.* at 855. Routine booking questions concerning an individual's identity and residence are generally permissible even without *Miranda* warnings. *United States v. Knope*, 655 F.3f 647, 652 (7th Cir. 2011).

### B. Window Tint Violation

Illinois has a statute which regulates the window tint allowed on vehicles registered in Illinois. *See* 625 ILCS 5/12-503 (a-5). Those regulations do not apply to "motor vehicles properly registered in another jurisdiction." 625 ILCS 5/12-503(f)(2). Redding and Moore testified they now know the statute would not apply to Defendant's vehicle which is registered in Tennessee. However, the officers testified that at the time of the traffic stop, they were not aware that the statute did not apply to vehicles registered in other states. While the stop would be valid if the officers reasonably believed Defendant committed a traffic violation, *see Cole*, 21 F.4th at 428, the Court is unable to find that a belief that Illinois restrictions on window tinting apply to vehicles properly registered in other states is reasonable. The subsection of the statute providing that the

limitations do not apply to out of state vehicles is just a few paragraphs below the subsection specifying the limitations. Therefore, if the officers were aware of the Illinois statute concerning limitations on tinted windows, they should have known it did not apply to vehicles registered in other states. Furthermore, given the lack of uniformity among states regarding the regulation of tinted windows, it would be impractical for the Illinois statute regulating tinted windows to apply to vehicles registered in other states.

While the Seventh Circuit does not appear to have addressed this particular issue, the Fourth Circuit in *United States v. Johnson*, 256 F.3d 214 (4th Cir. 2001) considered whether the stop of a Georgia resident in South Carolina for violating South Carolina's window tinting law violated the Fourth Amendment. *Id.* at 215-16. The law applied to vehicles "required to be registered" in South Carolina. *Id.* at 216. Because the officer did not have reasonable suspicion to believe a vehicle with valid Georgia license plates was required to be registered in South Carolina, the court found the traffic stop was invalid and the drugs that were discovered should have been suppressed. *Id.* at 217. Similarly, Redding and Moore did not have reasonable suspicion here to believe a vehicle registered in Tennessee was subject to the Illinois law on tinted windows. Therefore, the Court concludes that the officers did not reasonably believe that the tinted windows in Defendant's vehicle registered in Tennessee violated the Illinois statute.

### C.  Traffic Stop for Failure to Signal

Illinois law also requires that a driver signal before changing lanes or turning for at least 100 feet. *See* 625 ILCS 5/11-804(b). The Government contends the police officers had a valid basis to stop Defendant's vehicle when he did not properly signal before

turning in to the gas station. (Doc. 22 at 10.) At the suppression hearing, Defendant testified he did activate his turn signal soon after crossing the railroad tracks before getting into the turn lane, which would have been more than 100 feet before turning into the gas station. Defendant testified he was not immediately able to turn into the gas station because the light was red and traffic was backed up, which is consistent with Redding's body camera video. Moore testified he did not see Defendant's SUV stopped at the red light at the North Grand intersection. Defendant testified that, after being stopped, Redding informed him that the reasons for the stop were his tints and turn signal. Defendant stated Moore indicated the reason for the stop was the turn signal and may have said something about tints as well.

Moore testified Defendant activated his signal just before turning into the Circle K and did not use his signal within 100 feet of turning. The video of the stop indicated Redding twice stated the reasons for the stop were "tints and turn signal." Redding did not tell Defendant he failed to signal for 100 feet.

As noted above, both officers testified that Defendant signaled his turn but did not do so for 100 feet before turning. Both officers' reports stated that Defendant did not signal for 100 feet before turning. It is significant that during the traffic stop, neither officer told Defendant that the violation was failing to signal a turn for 100 feet. At one point during the stop, after Moore and Defendant discussed the tinted windows, Moore stated "but you got to use turn signal bro," to which Defendant responded, "I thought I did." Moore did not say you have to signal for 100 feet before turning. Redding had stated earlier that one of the reasons for the stop was "turn signal" without any further

elaboration. While these might seem like minor distinctions, the Court believes them to be significant when considering the validity of the traffic stop and the totality of the circumstances. This is particularly true upon considering that the officers were aware of a tip from a cooperating witness concerning a gun. This suggests the officers were looking for a traffic violation in order to stop Defendant to search for a gun. Moore's statement that, if Defendant had signaled properly, he "would be in Tennessee now" is also questionable at best because both officers testified they believed Defendant's window tints were illegal on the day of the stop.

Redding testified that the entire point of being in the area where the traffic stop occurred was to stop Defendant's vehicle. He acknowledged the officers wanted to stop the car and recover what they believed to be an illegal gun. Redding further testified that is a strategy police officers sometimes use when they want to stop a vehicle. Moore refused to admit that officers are trained that they can stop a vehicle with individuals thought to be involved with criminal activity if the officers observe a violation of the motor vehicle code. He further testified the officers were not in the area to try to find a way to stop Defendant's SUV. As the Government states, a traffic stop under these circumstances is entirely legal if the officers observe a traffic violation. *See United States v. Watson*, 558 F.2d 702, 703 (7th Cir. 2004). The violation is *Watson* was that the rear license plate was not illuminated in violation of state law. *Id.* at 704. "That they would not have stopped it had they not suspected a more serious violation—as they obviously did . . . .—is of no moment." *Id.* The fact that the officers here provided differing accounts as to why

they were present in the area raises questions about whether they actually observed the failure to signal for at least 100 feet.

It is also unclear how much of Defendant's vehicle Moore could see from his position behind Redding. Moore testified he could see the back of Defendant's vehicle because Redding's SUV is shorter than Defendant's SUV. However, the video showed Redding's SUV was only slightly shorter than Defendant's. The video also showed the brake lights and turn signals on Defendant's vehicle are below the back windshield and at the same height as the rear license plate. Moore agreed the rear brake light and turn signals were well below the roof of Redding's vehicle. While Moore's testimony was inconsistent as to whether he could see Defendant's rear license plate, the video showed it would have been nearly impossible for him to see the rear license plate. Because of the position of Redding's SUV, it also would have been almost impossible for Moore to see whether Defendant used his turn signal to turn into the gas station. Consequently, Moore's testimony that Defendant failed to signal for 100 feet before turning was not credible.

These inconsistencies along with the video of Defendant turning into the gas station call into question the alleged basis for the stop. Defendant's testimony was consistent with his statements at the scene of the traffic stop. For these reasons, the Court is unable to conclude that the Government has established by a preponderance of the evidence that the officers had reasonable suspicion that Defendant failed to signal properly before turning into the gas station.

### D.  Defendant's Statements After Being Handcuffed

Even assuming the officers had reasonable suspicion to believe Defendant committed a traffic violation and the initial stop did not violate the Fourth Amendment, the Court finds that statements made by Defendant after being handcuffed were made while he was in custody. Redding mentioned the "blicky" as he was handcuffing Defendant while Moore asked, "You got a blicky in there, bro?" Moore than asked "what's going on," before saying "What is, I don't know what's going on," and "I didn't search your car, I don't know what's up, you know what I mean?" At that point, Defendant admitted having a gun in the vehicle. While Redding continued searching the vehicle, Moore asked Defendant if he was nervous about the gun and whether he had a FOID card or concealed carry permit. Moore further asked Defendant if he had anything else on him because the officers "want to be sure before we holler at you."

While Moore may also have been trying to keep Defendant calm as the Government alleges, another purpose of that exchange obviously was "to elicit an incriminating response." It was not simply a volunteered statement by Defendant. The fact that Redding asked Moore, "what did he say about the gun," suggests that the officers were hoping to elicit an incriminating response by inquiring about a "blicky" and questioning what's going on. Because an objective observer would believe the exchange was reasonably likely to elicit an incriminating response, the Court concludes under *Swanson* that Defendant's statements were the products of a custodial interrogation. Because Defendant was not *Mirandized,* the Court concludes Defendant's statements

would be inadmissible even if the officers had reasonable suspicious that Defendant committed a traffic violation.

## IV.   CONCLUSION

For the reasons stated herein, the officers did not have reasonable suspicion to believe Defendant violated the Illinois statute on window tint limitations or the statute requiring a driver to signal for 100 feet before turning. Because the officers did not have a valid basis to stop Defendant's vehicle, the evidence and statements constitute fruit of the poisonous tree and must be suppressed. *See United States v. Wilbourn*, 799 F.3d 900, 910 (7th Cir. 2015); *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The Government has acknowledged that statements made by Defendant once he was handcuffed and inside Moore's squad car with the door shut—statements relating to his status as a felon and use of cocaine—along with statements made by Defendant during his interview at the Springfield Police Department should be suppressed. (Doc. 22 at 17-18.) The Court concludes that, because the officers lacked reasonable suspicion that Defendant committed a traffic violation, the seizure of Defendant violated the Fourth Amendment and the resulting evidence and  statements must be suppressed. Even if the officers had reasonable suspicion that a traffic violation occurred, the Court concludes that Defendant's statements to Moore at the gas station must be suppressed because they were the product of custodial interrogation without having received *Miranda* warnings.

Therefore, Defendant Michael D. Timms's Motion to Suppress Evidence and Statements (Doc. 20) is GRANTED.

ENTER: December 8, 2023

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE